IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF NEBRASKA

```
DAVID T. PIPER,                )
                              )
                              )          8:12CV69
                              )
           v.                 )
                              )
MICHAEL J. ASTRUE,            )      MEMORANDUM OPINION
Commissioner of Social        )
Security Administration,      )
                              )
              Defendant.      )
_____)
```

This matter is before the Court for review pursuant to
42 U.S.C. § 405(g) of the decision of defendant Commissioner of
the Social Security Administration ("SSA") denying social
security disability benefits ("SSD benefits") to plaintiff David
T. Piper.  Upon review, the Court finds the SSA's decision is
supported by substantial evidence and should be affirmed.

## I. BACKGROUND AND PROCEDURAL HISTORY

Mr. Piper was born in 1947.  Mr. Piper graduated from
high school and served in the United States military from
November 1966 to June 1969.  Mr. Piper has completed 125 hours of
college-level course work.  He has been married since 1973 and
has four adult children.  Mr. Piper worked for many years as a
carpenter and concrete quality control inspector, and more
recently as a telemarketer, insurance agent, parking garage
attendant, and test administrator (Tr. 243-50).

Mr. Piper alleges he has been disabled since June 15, 2006, due to a history of diabetes, obesity, sleep apnea, and degenerative disc disease.[1]  As of September 2006, Mr. Piper was 5'10" tall and weighed 250 pounds.

On June 15, 2007, Mr. Piper filed for SSD benefits (Tr. 129-31).  In connection with the application, Mr. Piper completed a Daily Activities and Symptoms Report dated July 7, 2007 (Tr. 189-93).  Mr. Piper stated that his symptoms included "memory loss, Diabetes, pain in feet, Dimming eyesight (sometimes), high blood sugars, Hard to see sometimes, Loss of concentration, Poor Circulation, fatigue, Body aches, feet stabbed with needles, Heart pounds" (Tr. 191).  Mr. Piper stated that his symptoms are located "All over," that he has his symptoms "every day," and that they last "All Day" (*Id.*).  Similarly, Mr. Piper's wife completed a Supplemental Information Form dated July 4, 2007 (Tr. 195-97).

During a routine medication follow-up doctor visit on August 20, 2007, Mr. Piper told the nurse that his pain score that day was one on a scale of zero to ten (Tr. 574).  When asked

---

[1] Mr. Piper amended his onset date from March 2002 to June 2006 at the hearing in front of the administrative law judge (Tr. 30-31).  During the period relevant to this appeal, Mr. Piper had numerous medical examinations relating to his impairments, as well as other unrelated medical issues.  These examinations are well documented in the record, in the ALJ's decision, and in the briefs submitted by both parties.  The Court will call attention only to those medical records that have particular significance for the appeal at hand.

if this is different from the pain he has every day, Mr. Piper answered "No" (*Id.*).

On September 10, 2007, Mr. Piper underwent examination by Roderick Harley, M.D., a state agency reviewing physician, who completed a Physical Residual Functional Capacity ("RFC") Assessment (Tr. 507-16). Dr. Harley listed Mr. Piper's diagnoses as history sleep apnea, type 2 diabetes, obesity, and mild degenerative disc disease. Dr. Harley opined that Mr. Piper's back impairments limited him to lift or carry no more than fifty pounds occasionally and twenty-five pounds frequently, stand or walk for a total of six hours in an eight-hour workday, and sit for a total of about six hours in an eight-hour workday. Dr. Harley stated that no communicative limitations, such as hearing or speaking, were established.

After summarizing Mr. Piper's medical visits, Dr. Harley concluded, "The claimant's allegations are felt to be only partially credible as on the initial he indicated he could not 'sit very long' but on his ADL form indicated he had no problems sitting and could sit for 4 hours" (Tr. 514). "His allegations of not being able to lift anything heavy and can't be on his feet very long are vague. . . . [H]e was installing cabinets in his house and on the ADL form indicated he worked around the house doing repair projects" (*Id.*). "The exams on multiple occasions do not document any specific neuro problems or problems with the

-3-

claimant's vision, back or feet . . . . [T]he claimant is capable of work activity during the period in question as per the above RFC" (*Id.*).

On September 11, 2007, the SSA denied Mr. Piper's initial SSD benefits claim (Tr. 66).  On October 10, 2007, Mr. Piper requested reconsideration of the SSA's decision (Tr. 77).  On January 28, 2008, another state physician, Jerry Reed, M.D., reviewed Mr. Piper's claim and affirmed Dr. Harley's RFC of September 10, 2007 (Tr. 641).  On January 29, 2008, Mr. Piper's reconsideration claim was also denied (Tr. 68).

On February 29, 2008, Charles K. Lee, M.D., reviewed Mr. Piper's case file and agreed with all aspects of the earlier RFC (Tr. 645-46).

On March 1, 2008, Judy K. Martin, M.D., analyzed Mr. Piper's case file with regard to mental health issues, issuing a one-page statement where she concluded, "Allegations of a mental condition are partially credible in that the MDI's of Dysthymic Disorder and Major Depression are supported in 2002.  MER reflects a positive response to treatment" (Tr. 647).  "The claimant has not followed up in treatment with no ongoing signs/symptoms reflected in the MER.  ADL's do not reflect severe limitations from a mental impairment.  No further development is necessary" (*Id.*).

On March 3, 2008, Mr. Piper applied for an appellate hearing with an administrative law judge ("ALJ") for his claim (Tr. 90).

On July 21, 2008, Mr. Piper's internist, Joel Armitage, M.D., completed a Multiple Impairment Questionnaire (Ex. 11F, Tr. 665-72 ("11F")).  Therein, Dr. Armitage stated that he sees Mr. Piper every three to six months for treatment of chronic disease, namely diabetes mellitus, insulin dependent; hyperlipidemia; and hypertension (Tr. 665).  Dr. Armitage stated that Mr. Piper's primary symptoms were "[b]ilateral needle pain in feet suggestive of diabetes neuropathy," that the pain occurred daily, precipitated by activity, and that the range of pain was four to five on a ten-point scale (Tr. 666-67).  Dr. Armitage stated that Mr. Piper's level of fatigue was one to two on a ten-point scale (Tr. 667).

Dr. Armitage stated that Mr. Piper could sit for four to five hours and stand/walk for three to four hours in an eight-hour day, and that it would be necessary or medically recommended that Mr. Piper not sit continuously in a work setting, such that Mr. Piper would get up and move around every thirty to sixty minutes and sit again after a few minutes (Tr. 667-68).  Dr. Armitage stated that it was "unclear" how much weight Mr. Piper could lift or carry (Tr. 668).

-5-

When asked if Mr. Piper's symptoms would likely increase if he were placed in a competitive work environment, Dr. Armitage answered "Yes" (Tr. 669). Dr. Armitage indicated that Mr. Piper's experience of pain, fatigue or other symptoms seldom or periodically are severe enough to interfere with attention and concentration (Tr. 670). Dr. Armitage indicated that emotional factors do not contribute to Mr. Piper's symptoms and functional limitations (*Id.*). Dr. Armitage wrote that it was unclear whether Mr. Piper would need to take unscheduled breaks to rest at unpredictable intervals during the workday and that it was unclear how often Mr. Piper would be absent from work due to his impairments (Tr. 670-71). Dr. Armitage indicated that the earliest date to which the description of Mr. Piper's symptoms and limitations applies is "now" (Tr. 671).

On August 5, 2009, David M. Conklin reviewed Mr. Piper's case file and affirmed the earlier RFCs dated September 10, 2007, and January 28, 2008 (Tr. 238). Mr. Conklin stated, "The claimant is still capable of performing past work as they described it" (*Id.*). Also on August 5, 2009, Michael Perll, M.D., reviewed Mr. Piper's case file and affirmed as written the earlier RFCs dated September 10, 2007, and January 28, 2008 (Tr. 793).

On November 23, 2009, Dr. Armitage completed another questionnaire, this time a Diabetes Mellitus Impairment

-6-

Questionnaire (Ex. 19F, Tr. 805-10 ("19F")). Therein, Dr. Armitage stated that he sees Mr. Piper every three months for treatment of diabetes mellitus, which Dr. Armitage states is a chronic illness, likely to develop complications over time, and unlikely to improve" (Tr. 805). Dr. Armitage stated that Mr. Piper's primary symptoms were "chronic pain in both legs, loss of sensation and loss of position, [unreadable], fatigue, malaise, [and] depression" (Tr. 806). Dr. Armitage stated that Mr. Piper had suspected peripheral vascular disease and peripheral neuropathy (Tr. 807).

Dr. Armitage stated that Mr. Piper could sit for two hours and stand/walk for two hours in an eight-hour day, that it would be necessary or medically recommended that Mr. Piper not sit continuously in a work setting, and that it would be necessary or medically recommended that Mr. Piper not stand/walk continuously in a work setting (Tr. 808). Dr. Armitage stated that Mr. Piper could lift and carry up to ten pounds occasionally but could never lift or carry more than ten pounds (Tr. 808-09).

Dr. Armitage indicated that emotional factors, namely depression, do contribute to Mr. Piper's symptoms and functional limitations (Tr. 809). Dr. Armitage stated that Mr. Piper's medical conditions limit the amount of stress that Mr. Piper can tolerate (Id.). Dr. Armitage indicated that Mr. Piper's experience of pain, fatigue or other symptoms frequently or

-7-

constantly are severe enough to interfere with attention and concentration (*Id.*).  Dr. Armitage wrote that Mr. Piper would be absent from work due to his impairments or treatment frequently, more than three times a month (Tr. 809-10).  Dr. Armitage indicated that the earliest date to which the description of Mr. Piper's symptoms and limitations applies is "years ago" (Tr. 810).

At Mr. Piper's request, an adminstrative hearing took place on January 21, 2010, in Omaha, Nebraska, before ALJ Jan E. Dutton to review Mr. Piper's SSD-benefits claim (Tr. 27-65).  When asked by the ALJ why he could no longer work as a telemarketer, Mr. Piper testified, "While I was working at telemarketing I developed a ringing in my ears.  I just couldn't listen to those phones anymore" (Tr. 39-40).  When asked if he wore a headset to mask the noise, Mr. Piper replied, "Oh yes, but they control the volume.  They turned it up and down someplace in the building" (Tr. 40).  Mr. Piper stated that he did not submit employment applications to other telemarketers who might operate differently (*Id.*).  Mr. Piper testified that while his boss allowed him to stand up and sit down in his booth, he believed that other telemarketers would not allow this flexibility (Tr. 41).

Mr. Piper stated that a "car place" declined to hire him because Mr. Piper told the potential employer of his

-8-

diabetes, and the employer had had another employee with diabetes that didn't work out (Tr. 42).  When asked by the ALJ why diabetes would affect his ability to work at the car place,  Mr. Piper answered, "Tell you the truth, as far as the other person, I don't know, but I felt I could handle the job, but I just couldn't get it" (*Id.*).  When the ALJ asked Mr. Piper what had gotten worse, or what had changed, such that he could no longer work, Mr. Piper replied,

> That's a good question.  I think things have gotten worse.  At what point, I can't really say because it's just kind of gradual.  A lot of things in my record I – I didn't tell the doctor because I didn't want to be one of the complainers. I just hate doctor's appointments. So, I just tell the minimum, and try to get out of there, and I suppose I did myself a disservice there because I should have told them everything, but I didn't.  I was trying to get a job.  That's what I wanted to do.

(Tr. 43).  Mr. Piper stated that he could lift twenty-five pounds more than once but not more than twice, and that he would feel comfortable lifting ten or fifteen pounds without any worry (Tr. 56-57).

When questioned by his representative, Mr. Piper stated that he was fired from his part-time job as a test administrator because "[t]hey said I couldn't handle the job" (Tr. 43).  When asked to elaborate, Mr. Piper stated, "Well, I couldn't – my

-9-

point of attention span didn't work out, and on the phone I just
– that ringing in my ears, it drove me crazy" (*Id.*).

Mr. Piper's representative stated that Mr. Piper had
been complaining of foot pain since August 2007.  When asked how
his pain compared to that time, Mr. Piper replied, "Well, it's a
little worse now" (Tr. 45).  Mr. Piper stated that he has to lie
down for about an hour, typically twice a day (Tr. 47-48).  Mr.
Piper stated that he has bad days about once a week, where he is
not able to leave the house (Tr. 49).  Mr. Piper stated that
because of his diabetes, he experiences pain all over his body
sometimes, always present, at a two on a scale of one to ten (Tr.
51).  Mr. Piper states that he has to take breaks from his
woodworking hobby quite often due to fatigue, and that he lasts
for only up to one hour (Tr. 56).

Next, vocational expert Deborah Determan testified at
Mr. Piper's hearing.  The ALJ posed the following hypothetical to
the vocational expert:

> The first question I have is for
> light exertional work.  If the
> claimant could occasionally lift or
> carry twenty pounds; frequently
> lift or carry ten pounds; stand,
> sit, walk six hours in an eight-
> hour day; could occasionally do
> postural activities, climb,
> balance, stoop, kneel, crouch,
> crawl; should avoid concentrated
> exposure to cold and hazards.
>
> I'm not finding a severe mental
> impairment, and I'm not finding a

-10-

> hearing impairment.  With that
> functional capacity could he return
> to any of his past work?

(Tr. 59).  Based on the hypothetical, the vocational expert opined that such an individual "could return to the past work as a parking lot attendant, and as a telemarketer" (*Id.*).  The vocational expert testified that in the state of Nebraska, there exist approximately 200 jobs as parking lot attendant and 5,500 jobs as telemarketer (*Id.*).

The ALJ then posed a second hypothetical to the vocational expert at the hearing:  "Based on the opinion of Dr. Arm[i]tage at 11F, do you think the claimant could return to the two jobs you've identified?" (Tr. 61).  Based on Exhibit 11F, the vocational expert answered that "within this set of restrictions, a person could perform the past work as a parking lot attendant or as a telemarketer" (Tr. 61-62).

Next, the ALJ then posed a third hypothetical to the vocational expert:  "Now, if you would, please look at 19F, and the pertinent part of this would be Dr. Arm[i]tage apparently changing his position, opinion about maximum workday and reducing it down to about half-time.  Would that in and of itself preclude competitive full-time employment?" (Tr. 62).  Based on Exhibit 19F, the vocational expert answered, "Yes, if a person's not able to work on a full-time basis, then that's going to preclude them from competitive employment" (*Id.*).

-11-

Finally, the ALJ posed a fourth question to the vocational expert: "[I]f the claimant's testimony is considered to be credible do you think that he could do his past jobs?  The two that we're referring to, telemarketer and parking lot?" (*Id.*).  The vocational expert answered, "[B]ased on the claimant's testimony, a person would be precluded from the past work" because "[h]e's indicated that on his bad days that he's essentially unable to leave his home, and he estimated that that would occur one time a week.  That alone, and by itself is going to preclude competitive employment" (*Id.*).  In addition, lying down for an hour two times a day "is not going to be consistent with normal work breaks.  So, that also is going to preclude competitive employment" (Tr. 62-63).  "Also, the characteristics that he, the characteristics of his capabilities with respect to sitting, standing, and walking is as he described them, would be at a level of less than sedentary.  So, that also would preclude competitive employment" (Tr. 63).

At the end of the hearing, the ALJ allowed Mr. Piper's representative to contact Dr. Armitage to request an explanation for the differences between the impairment questionnaires dated July 21, 2008 (11F), and November 23, 2009 (19F), because the ALJ stated that she "can't really figure out what would have caused him to change his opinion during that timeframe . . ." (Tr. 64).  The ALJ suggested that Mr. Piper's representative determine

-12-

whether Dr. Armitage might want "to defend some date when he thinks [Mr. Piper's] condition worsened" (*Id.*).

On February 1, 2010, Mr. Piper's representative submitted to the ALJ a statement by Dr. Armitage dated January 29, 2010, regarding the differences between his answers on the two previous questionnaires describing Mr. Piper's limitations (Tr. 877).  Dr. Armitage's statement, in its entirety, reads

> To whom it may concern regarding David Piper:
>
> I received a request, regarding Mr. Piper's request to obtain social security disability, to clarify two conflicting letters assessing his status from a health standpoint.  The first letter was written with the patient having not divulged much of his difficulties he was having.  The second letter was written with this in mind.  Specifically, his neuropathy, inattention, and depression have likely led to his inability to maintain jobs in the past and continue to be an issue for him.  His neuropathy will not improve.  He regularly uses his CPAP at home for OSA and though his attention and daytime alertness have improved he still has daytime somnolence.  His depression is in the early stages of treatment and as of yet I cannot say how easy it will be to treat, though this is a significant roadblock for this patient as regards to getting and maintaining a job in my opinion based on the history provided from the patient and his spouse.  In conclusion, the main reason for the disparity of the two letters was I was provided

-13-

>           vastly more information prior to
>           writing the second letter in
>           regards to his health.  I hope this
>           meets your satisfaction as an
>           explanation. I am happy to discuss
>           further or elucidate concerns as I
>           am able.
>
>           Joel Armitage, M.D.

(Tr. 878).

On May 19, 2010, the ALJ issued an unfavorable opinion affirming the denial of Mr. Piper's SSD-benefits claim (Tr. 18-26).  The ALJ evaluated Mr. Piper's claim under the SSA's five-step sequential process.  *See* 20 C.F.R. § 404.1520(a).  At step one, the ALJ found that Mr. Piper had not engaged in substantial gainful activity since June 15, 2006, the alleged onset date of his disability.

At step two, the ALJ found that Mr. Piper's impairments, diabetes mellitus, sleep apnea, obesity, and degenerative disc disease, were severe.  But the ALJ also concluded, "The claimant's medically determinable mental impairments of a depressive disorder; posttraumatic stress disorder; hypertension; and mild hearing loss, considered singly and in combination, do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore 'nonsevere' in this context" (Tr. 22).

At step three, the ALJ found that Mr. Piper's impairments did not meet one of the listed impairments found in 20 C.F.R. pt. 404, subpt. P, app. 1.

Next, the ALJ determined that Mr. Piper had a residual functional capacity "to perform light work as defined in 20 CFR 404.1567(b) except that he can stoop, kneel, crouch, crawl, and bend only occasionally; he can use his hands for frequent, not constant handling, fingering, and feeling.  He should avoid concentrated exposure to extreme cold and to hazards such as unprotected heights" (Tr. 22).  While the ALJ found Mr. Piper's "medically determinable impairments could reasonably be expected to cause at least some of the symptoms he alleged," nevertheless, the ALJ found that Mr. Piper's "statements concerning the intensity, persistence and limiting effects of these symptoms are not fully credible" (Tr. 23).

The ALJ also discounted the opinion of Dr. Armitage, which the ALJ characterized as "inconsistent with other substantial evidence in the record and with the doctor's clinical notes," and "also at odds with the claimant's self-assessment" (Tr. 25).  The ALJ stated that Dr. Armitage "was doing little more than recording the claimant's description of his limitations" (*Id.*).

Finally, the ALJ also discounted the statement of Mr. Piper's wife, "which is essentially a recitation of the

-15-

claimant's symptoms and is not given controlling weight for the same reason's [sic] her husband's alleged disability is not found to be fully credible to the extent of total disability" (*Id.*).

The ALJ noted, "Five DDS medical doctors/evaluators reviewed this claim and none felt the claimant was limited to more than medium work and that his mental condition was nonsevere" (Tr. 25 (citations omitted)).  "While the undersigned has given him the benefits of doubt and used a light residual functional capacity (because claimant asserts he cannot lift more than 25 pounds), the general analysis of DDS is given controlling weight" (Tr. 25).  "In sum, the above residual functional capacity assessment is supported by the persuasive medical evidence in the record" (Tr. 26).

At step four, the ALJ found that Mr. Piper was able to perform his past relevant work as a parking lot attendant and as a telemarketer, work that "does not require the performance of work related activities precluded by the claimant's residual functional capacity" (Tr. 26).  The ALJ then had no need to determine at step five whether Mr. Piper was able to do any other work aside from his past relevant work.  In summary, the ALJ found that Mr. Piper "has not been under a disability, as defined in the Social Security Act, from June 15, 2006, through the date of this decision" (*Id.*).

-16-

On June 8, 2010, Mr. Piper requested review of the ALJ's decision by the SSA's Appeals Council (Tr. 13).  On December 20, 2011, the Appeals Council declined Mr. Piper's request for review; thus, the ALJ's decision is now the final decision of the Commissioner (Tr. 3).  Mr. Piper timely filed a complaint with the United States District Court for the District of Nebraska on February 16, 2012 (Filing No. 1).

## II.  DISCUSSION

### A.  Standard of Review.

When reviewing an ALJ's decision, the Court "must determine 'whether the ALJ's decision complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole.'"  *Martise v. Astrue*, 641 F.3d 909, 920 (8th Cir. 2011) (quoting *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010)).  "Substantial evidence" is:

> relevant evidence that a reasonable mind might accept as adequate to support a conclusion.  Substantial evidence on the record as a whole, however, requires a more scrutinizing analysis.  In the review of an administrative decision, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight.  Thus, the court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory.

*Id.* at 920-21.

-17-

"'If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision.'" *Partee v. Astrue*, 638 F.3d 860, 863 (8th Cir. 2011) (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)).  The Court may not reverse the ALJ's decision "merely because [the Court] would have come to a different conclusion." *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011)(citation omitted).  The claimant "bears the burden of proving disability." *Id.* at 615.

**B.   Substantial Evidence Exists Supporting the ALJ's Decision.**

**1.   Dr. Armitage's Opinions**.  Mr. Piper's first assignment of error is that the ALJ impermissibly discounted the opinion of Dr. Armitage.  Generally, a treating physician's opinion is entitled to substantial weight. *Martise*, 641 F.3d at 925 (quoting *Brown v. Atrue*, 611 F.3d 941, 951-52 (8th Cir. 2010)).  Nevertheless, an ALJ "may justifiably discount a treating physician's opinion when that opinion 'is inconsistent with the physician's clinical treatment notes.'" *Id.* (quoting *Davidson v. Astrue*, 578 F.3d 838, 843 (8th Cir. 2009)).

In this case, the ALJ found that Dr. Armitage's second opinion supporting Mr. Piper's disability (19F), which was given in November 2009 after Mr. Piper filed for SSD benefits, was contrary to his previous treatment notes regarding Mr. Piper.  As

-18-

outlined by the ALJ, "For example, the doctor indicated that the claimant experienced muscle weakness; swelling in his lower extremities; a loss of manual dexterity; and difficulty walking. (Exhibit 19F/2)[.]  However, the doctor never recorded or discussed any of those symptoms in any of his clinical notes" (Tr. 25).

The Court notes that Mr. Piper claims that diabetic neuropathy is his "primary problem" (Filing No. 16, at 13).  Yet the record reads differently.  On August 20, 2007, the day Mr. Piper first saw Dr. Armitage, Mr. Piper placed his pain at one on a zero to ten scale, and when asked, "Is this different from the pain you have every day?" answered "NO" (Tr. 783-84).  On February 4, 2008, Mr. Piper placed his pain at one on a zero to ten scale, and when asked, "Is this different from the pain you have every day?" answered "NO" (Tr. 762).  On June 23, 2008, Mr. Piper placed his pain at zero on a zero to ten scale, and when asked, "Is this different from the pain you have every day?" answered "NO" (Tr. 751).  On December 22, 2008, Dr. Armitage reported that Mr. Piper was in "[n]o acute distress" and that "[s]ince the last visit he did start taking gabapentin with great relief of his foot pain" (Tr. 737).  In fact, while Dr. Armitage stated in 19F that Mr. Piper's neuropathy "will not improve," during Mr. Piper's most recent visit preceding this statement, Dr. Armitage made no finding regarding neuropathic pain and

stated that Mr. Piper exhibited "[n]o acute distress" (Tr. 905). These ongoing positive reviews of Mr. Piper's condition contained in the medical record are inconsistent with Dr. Armitage's second disability opinion given in 2009 (19F).

Moreover, in the candid words of Mr. Piper's representative, Dr. Armitage's second disability opinion given in 2009 showed a "drastic increase in terms of the doctor's restrictions" (Tr. 877). Dr. Armitage attempted to explain the "drastic increase" in his letter quoted at p. 13-14 above. Dr. Armitage states that he now has "vastly more information" with which to assess Mr. Piper, but does not clearly state the nature or source of this information. Dr. Armitage merely states, "The first letter was written with the patient having not divulged much of his difficulties he was having. The second letter was written with this in mind" (Tr. 878). The Court agrees with the SSA's assessment that "this only supports the ALJ's conclusion that Dr. Armitage relied heavily on Plaintiff's subjective complaints when writing the opinion (Tr. 25). As the ALJ found Plaintiff's complaints to be not entirely credible [see below], an opinion based on those complaints is similarly unsupported" (Filing No. 23, at 16).

Even taking into consideration the fact that Mr. Piper testified that he was reticent about discussing his medical issues with his providers because he did not want to appear to be

a "complainer," the record simply does not provide substantial evidence for the dramatic difference in the opinions of Dr. Armitage.  Moreover, in his statement of January 29, 2010, the Court finds that Dr. Armitage did not provide an adequate reason as to why his second disability opinion is so different from both the first disability opinion and from his treatment notes. Because Dr. Armitage's second disability opinion was inexplicably contrary to both his treatment notes and his first disability opinion, the ALJ was entitled to discount Dr. Armitage's second disability opinion.

Mr. Piper also complains that the ALJ did not adequately weigh Dr. Armitage's opinions using the factors listed in 20 C.F.R. § 404.1527(c).  But the Court notes that the ALJ specifically cited that regulation, stating that she "also considered opinion evidence in accordance with [its] requirements" (Tr. 23).  The Court finds that she effectively addressed each of the factors so listed.[2]

**2.   RFC Assessment.**  Mr. Piper states that the ALJ did not have proper support for the RFC that she adopted in this

---

[2] The Court notes in particular that while Mr. Piper argues that Dr. Armitage was Mr. Piper's "long-time treating physician" (Filing No. 16, at 11), Dr. Armitage only began seeing Mr. Piper on August 20, 2007 (Tr. 533), and, by his own admission, did not know much about Mr. Piper's difficulties after almost a year of treatment, such that he had to drastically change his July 2008 opinion.

case.  The ALJ determined that Mr. Piper had an RFC "to perform light work as defined in 20 CFR 404.1567(b) except that he can stoop, kneel, crouch, crawl, and bend only occasionally; he can use his hands for frequent, not constant handling, fingering, and feeling.  He should avoid concentrated exposure to extreme cold and to hazards such as unprotected heights" (Tr. 22).  Mr. Piper states that "the ALJ's RFC that Mr. Piper can perform substantially the full range of light work is not supported by any evidence.  She simply stated that she adopted the non-examining physician's opinions that Mr. Piper could perform medium work and reduced their findings to a light RFC" (Filing No. 16, at 12).  Mr. Piper states that the ALJ "failed to cite to any evidence that would support making such an inference, when all the other evidence found Mr. Piper could not perform even sedentary work capabilities, which requires sitting at least six hours a day" (*Id.*).

Yet the only evidence that supports this conclusion is Dr. Armitage's second disablility opinion, which the ALJ reasonably discredited, and Mr. Piper's testimony, which the ALJ found to lack credibility (see below).  On the contrary, the Court agrees with the SSA's assessment that the ALJ "properly formulated the RFC based on her evaluation of the evidence of [the] record as a whole" (Filing No. 23, at 20).  The Court finds

that the ALJ's assessment of Mr. Piper's RFC is supported by substantial evidence.

       3.  **Consideration of Obesity**.  Mr. Piper argues that the ALJ did not properly consider Mr. Piper's obesity. Specifically, Mr. Piper states that the ALJ did not consider SSR 02-1p, which requires that obesity must be considered at step four.  Yet at step two, the ALJ specifically stated that Mr. Piper's obesity severely impaired him (Tr. 20).  In addition, in formulating Mr. Piper's RFC, the ALJ cited Mr. Piper's weight twice, thus placing his weight into consideration (Tr. 21). While it is true that the ALJ did not specifically reference SSR 02-1p, the Court finds that she effectively addressed Mr. Piper's obesity.

       4.  **Evaluation of Mr. Piper's Credibility**.  An ALJ's credibility findings must be supported by substantial evidence. *Robinson v. Sullivan*, 956 F.2d 836, 839 (8th Cir. 1992).  "In analyzing a claimant's subjective complaints of pain, an ALJ must examine: '(1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; [and] (5) functional restrictions.'"  *Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001) (quoting *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)).  If the ALJ gives a "good" reason for not crediting the claimant that is supported

by the record, the Court will defer to the ALJ's judgment.
*Robinson*, 956 F.2d at 841.

Here, the ALJ found that "the claimant's medically
determinable impairments could reasonably be expected to cause at
least some of the symptoms he alleged.  However, the claimant's
statements concerning the intensity, persistence and limiting
effects of these symptoms are not fully credible" (Tr 23).  The
ALJ stated that there were "several factors that detract from the
claimant's credibility" (*Id.*).  First, the ALJ noted that Mr.
Piper "told a medical source on May 23, 2002 that he did not feel
that any of the experiences he had while in the Army in Viet Nam
were distressing and that he had <u>not</u> 'reexperienced' any of the
incidents" (*Id.*).  Yet the day before, while Mr. Piper "sought an
evaluation at the VA facility for the purpose of establishing
that he had post-traumatic stress disorder," he had given a
detailed account of being under fire in Viet Nam and the problems
this creates for him, such as "intrusive recollections" and
nightmares (Tr. 23-24).

As another example, the ALJ noted that Mr. Piper
testified that he could not return to his job as a telemarketer
because of the ringing in his ears.  But as the ALJ states, "in a
written statement in June of 2009, the claimant said that his
hearing was not affected by his medical conditions" (Tr. 24).
The Court notes that on other occasions not cited by the ALJ, Mr.

-24-

Piper also denied being bothered by tinnitus, or ringing in his ears. For example, a primary care outpatient note dated December 22, 2008, and signed by Dr. Armitage states, "No hearing, vision problems" (Tr. 737). In addition, an audiology consult note dated July 22, 2009, states, "Discussed amplification options for veteran's high frequency hearing loss and the possibility of this helping with his tinnitus. Veteran is not interested at this time, as he does not perceive his tinnitus as bothersome" (Tr. 722).

The ALJ also noted that while Mr. Piper testified that he had problems with sitting and standing, an April 2007 treatment note states that "the claimant reported that he was 'doing well' and that he was 'staying active by working on his house' and was installing cabinets. The only complaint recorded that day concerned his left knee pain that improved when he used Tylenol" (Tr. 24). The Court notes that in a diabetes care management note dated October 10, 2006, three months after Mr. Piper's alleged onset date, Clare Korolchuk, RN, CDE, noted, "[Mr. Piper] has also been very physically active putting a new roof on his house" (Tr. 300).

The Court notes that as described above in the discussion concerning Dr. Armitage, on several occasions Mr. Piper placed his pain at a level of zero or one on a zero to ten-point scale and stated that this was not different from the pain

he felt every day.  Yet in his statement to the SSA, Mr. Piper avowed that his symptoms are located "All over," that he has his symptoms "every day," and that they last "All Day" (Tr. 191).

Based on the foregoing, the Court finds that when viewing the evidence in the record as a whole, Mr. Piper's statements concerning the intensity, persistence, and limiting effects of his symptoms are inconsistent and not fully credible and that the ALJ's credibility assessment is supported by substantial evidence.

5. **Vocational Expert Testimony**.  Mr. Piper's final assignment of error is that the ALJ improperly relied on the testimony given by the vocational expert at the hearing.  Mr. Piper states that since the ALJ's "RFC assessment is not supported by substantial evidence . . . , the VE's response to that RFC in the hypothetical question cannot be relied upon" (Filing No. 16, at 17-18).  The Court has already found that the ALJ's assessment of Mr. Piper's RFC is supported by substantial evidence.  Likewise, after reviewing the record as a whole, the Court finds that substantial evidence supports the ALJ's reliance on the opinion of the vocational expert and the ALJ's conclusion that Mr. Piper could return to his past work as a parking lot attendant and as a telemarketer.

### III.   CONCLUSION

Substantial evidence in the record as a whole supports the ALJ's determination that Mr. Piper was not disabled, and the ALJ's decision complies with the relevant law.  The SSA's denial of Mr. Piper's SSD benefits claim will be affirmed.  A separate order will be entered in accordance with this memorandum opinion.

DATED this 23rd day of January, 2013.

BY THE COURT:

/s/ Lyle E. Strom

_____
LYLE E. STROM, Senior Judge
United States District Court

-27-